UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

15 CV 01876

Q.W.H., by her parent, L.W., and L.W.,

                  Plaintiffs,

    v.

NEW YORK CITY DEPARTMENT OF
EDUCATION, NEW YORK CITY BOARD OF
EDUCATION, and CARMEN FARIÑA, in her
official capacity as Chancellor of the New York City
Department of Education,

                  Defendants.

COMPLAINT
Civil Action No.

JUDGE CAPRONI



## COMPLAINT

1.     This is an appeal seeking to reinstate an impartial hearing officer's order finding that the New York City Department of Education ("DOE") denied Q.W.H. a free appropriate public education for the 2012-2013 school year, and requiring the DOE to pay for Q.W.H.'s education at the Cooke Center Grammar School ("Cooke") for that year.

## PRELIMINARY STATEMENT

2.     Plaintiff Ms. W., on behalf of herself and her child, Plaintiff Q.W.H., an eleven year old, sixth grade student at the time of the hearing, brings this action pursuant to Section 1415(i)(2) of the Individuals with Disabilities Act ("IDEA"), as amended (20 U.S.C. § 1400 *et seq.*); and N.Y. Educ. Law §§ 4401, 4404, 4410; 8 N.Y.C.R.R. § 200, against the DOE, the New York City Board of Education ("Board"), and Carmen Fariña, Chancellor of the New York City Department of Education ("the Chancellor"), seeking

review and reversal of the State Review Officer's decision dated November 12, 2014,

and reinstatement of the impartial hearing officer's order that the DOE pay for Q.W.H.'s

tuition at Cooke for the 2012-2013 school year.

3.      The IDEA and New York Education Law require that all students with disabilities be

provided a free appropriate public education ("FAPE").

4.      As a young child, Q.W.H. was found eligible for Early Intervention Services because of

a language delay. Ex. 6-2; Tr. 169, 179.[1]  She attended an early childhood Learning

Center and received speech and language therapy, occupational therapy, physical

therapy and counseling through the Committee on Preschool special education. Ex. 6-2;

Tr. 169.

5.      When she transitioned into kindergarten, Q.W.H. was classified as speech and language

impaired and was placed in a 12:1:1 class—a class with twelve students, one teacher and

one paraprofessional—in a community school. *See* Tr. 169-70, Ex. D-1. Q.W.H.

struggled in that setting for four years and had to repeat the second grade. Tr. 170-71;

Ex. D; Ex. I-1. In September 2010, Ms. W. enrolled Q.W.H. at Cooke, a private school

for children with special education needs. Ex. 7-2; Tr. 175. Q.W.H. remained at Cooke

during the 2010-2011 and 2011-2012 school years and made academic progress for the

first time. Tr. 157-58; Ex. F-9. The DOE funded Q.W.H.'s tuition at Cooke during

those years. Ex. 1-3.

---

[1] All references to "Tr." are references to the impartial hearing transcript and all references to "Ex." are to exhibits
entered into evidence during the impartial hearing.

6.  On February 28, 2012, the Committee on Special Education ("CSE") met to create an Individualized Education Program ("IEP") for Q.W.H. for the 2012-2013 school year, Q.W.H.'s sixth grade year. Ex. 7. The CSE classified Q.W.H. as intellectually disabled and recommended a 12:1:1 class, with speech and language therapy, occupational therapy, and counseling as related services. Ex. 7. The IEP lists Q.W.H.'s reading comprehension at a first grade level, and her math skills at an early second grade level. Ex. 7-1. On August 27, 2012, the DOE offered a placement at P373K @ the Brooklyn Transition Center. Ex. N-1.

7.  Neither Q.W.H.'s IEP, nor the proposed placement at P373K were able to meet her needs. As set forth above, Q.W.H. spent four years in 12:1:1 programs and received little educational benefit. Moreover, the school placement at P373K was inappropriate because, according to the school employee who provided Ms. W. with a tour of the school (the "School Representative"), the school was a high school with one sixth grade class, the academic levels of the students in the sixth grade class were between first and seventh grade—a range too high for Q.W.H.—and paraprofessionals, rather than the teacher, taught the class. *See* Tr. 184-85, 202-03; Ex. L.

8.  During an impartial hearing that took place on January 23, 2013 and February 27, 2013, Ms. W. testified about her visit to P373K, and the information the School Representative provided to her during her visit. The DOE, by contrast, did not put on evidence that the placement it offered was appropriate. Instead, it relied on one rebuttal witnesses who could not confirm that P373K even had a 12:1:1 6th grade class. Impartial Hearing Officer Decision ("IHO Dec.") at 7; Tr. at 212-14.

9.   On April 3, 2013, the Impartial Hearing Officer ("IHO") found that "the DOE failed to provide [Q.W.H.] with FAPE for the 2012-2013 school year based on the failure of the DOE to offer an appropriate placement." IHO Dec. at 7. The IHO further found that Cooke was an appropriate placement and that Ms. W. "cooperated fully with the IEP process," "visited the placement as soon as was feasible" and "notified the DOE" that she did not find the program appropriate. *Id.* at 9.

10.  Based on these findings, the IHO ordered that the DOE pay for the cost of Q.W.H.'s 2012-2013 tuition at Cooke. *Id.* at 10.

11.  The State Review Officer ("SRO") reversed the IHO's order of tuition, concluding erroneously that the DOE's placement recommendation was irrelevant to a determination of whether the DOE provided FAPE because Q.W.H. did not attend the DOE's recommended placement. State Review Officer Decision ("SRO Dec.") at 8. Such a finding is directly contrary to the relevant law.

12.  The SRO further found—without any evidentiary support and despite the uncontroverted evidence to the contrary—that even if the parent could challenge the school placement at P373K, "the evidence in the hearing record does not support the conclusion that the district would have....deviated from the student's IEP in a material or substantial way" by placing her at P373K. SRO Dec. at 9.

13.  The SRO's decision overturning the IHO's finding that the DOE did not provide Q.W.H. with an appropriate placement is legally and factually erroneous. First, the SRO's determination that any testimony about the DOE's proposed placement is "speculative" and therefore irrelevant to the inquiry of whether the DOE provided FAPE is based on

4

an incorrect reading of the Second Circuit's decision in *R.E. v. New York City Dep't of Educ.*, 694 F.3d 167 (2d Cir. 2012). Second, the SRO's conclusion without any analysis that, even if the DOE's proposed placement was relevant to the inquiry, the placement was appropriate, is not based on the evidence, is not well-reasoned, and should be overturned.

14.     The SRO's finding that the 12:1:1 program specified in Q.W.H.'s IEP was appropriate is also contrary to the evidence and should be overturned.

15.     The IHO's determination that Cooke was an appropriate placement for Q.W.H. was not challenged by the DOE on appeal and cannot be challenged here. SRO Dec. at 4 (citing 34 CFR 300.514[a]; 8 NYCRR 200.5[j][5][v]).

16.     Finally, the IHO's well-reasoned determination that the equities favor Ms. W. should be upheld.

17.     As such, Ms. W. respectfully requests that this Court:

A.     reverse the SRO's decision of November 12, 2014;

B.     reinstate the IHO's order of April 3, 2013 that the DOE pay Q.W.H.'s tuition at Cooke for the 2012-2013 school year;

C.     order the DOE to make payment in the form of direct funding for the cost of tuition at Cooke for the 2012-2013 school-year;

D.     declare that plaintiffs are the substantially prevailing party for purposes of attorneys' fees; and

E.    grant plaintiffs any additional relief that the Court deems appropriate.

## JURISDICTION

18.   This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343 and 20 U.S.C.

§§ 1415(i)(2)(A) and (3)(A).  This Court has supplemental jurisdiction over all state law

claims herein asserted pursuant to 28 U.S.C. § 1367, as such state law claims form part

of the same case or controversy as the claims for which this Court has original

jurisdiction.

19.   Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events

giving rise to this case occurred in this judicial district.

20.   If successful, Ms. W. is entitled to costs and attorneys' fees under 42 U.S.C. § 1988(b)

and 20 U.S.C. § 1415(i)(3)(B) *et seq.*

## PARTIES

21.   Initials are used throughout this Complaint to preserve the privacy and confidentiality of

the student ("Q.W.H.") and the mother (Ms. W.) consistent with the privacy provisions

promulgated under section 1417(c) of the IDEA and the Family Education Rights and

Privacy Act, 20 U.S.C. § 1232g.

22.   Q.W.H. was born in February 2001.  Q.W.H. has been classified as a student with a

disability since preschool.  At the time the due process complaint initiating this case was

filed, on December 18, 2012, Q.W.H. was classified as intellectually disabled and had a

seizure disorder.  Ms. W. is the parent of Q.W.H.  Q.W.H. resides with Ms. W. in New York City.

23.    Upon information and belief, Defendant THE NEW YORK CITY DEPARTMENT OF EDUCATION ("DOE") is a corporate body, created by Article 52 of the New York State Education Law, CLS Educ. Law § 2250 *et seq.*, that manages and controls the public school system of the City of New York.  Upon information and belief, the DOE receives federal funding pursuant to the IDEA and therefore must comply with that statute's provisions, including providing a FAPE to all students with disabilities who reside in the City of New York, such as Q.W.H.  *See* 20 U.S.C. § 1412.  The DOE's principal place of business is 52 Chambers Street, New York, NY 10007.

24.    Upon information and belief, Defendant THE NEW YORK CITY BOARD OF EDUCATION ("Board") was or continues to be the official body charged with the responsibility for developing policies with respect to the administration and operation of the public schools in the City of New York, including programs and services for students with disabilities.  N.Y. Educ. Law §§ 2590, 2590-g.  It is a recipient of federal financial assistance.

25.    Upon information and belief, Defendant CARMEN FARIÑA is the Chancellor of the New York City Department of Education ("the Chancellor") and as such is entrusted with the specific powers and duties set forth in N.Y. Educ. Law § 2590-h, including ensuring the DOE's compliance with all federal and state laws and regulations such as the IDEA and New York State Education Law.

## LEGAL STANDARDS

### The Law Requires That the DOE Provide All Students with a FAPE

26.    States receiving federal funds under the IDEA must provide to all children with

disabilities a "free appropriate public education." 20 U.S.C. § 1412(a)(1)(A); *M.H. v.*

*New York City Dep't. of Educ.*, 685 F.3d 217, 223 (2d Cir. 2012). "To meet [the

IDEA's] requirements, a school district's program must provide 'special education and

related services[,]' tailored to meet the unique needs of a particular child, and be

reasonably calculated to enable the child to receive educational benefits." *Id.* at 224

(alterations in original) (quoting *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105,

107 (2d Cir. 2007) and 20 U.S.C. § 1401(9)) (internal quotation marks omitted). "Such

services 'must be administered according to an individualized education program . . .,

which school districts must implement annually.'" *Id.* (alteration in original) (quoting

*Bd. of Educ. v. Rowley*, 458 U.S. 176, 207 (1982) and 20 U.S.C. § 1414(d)).

27.    An individualized education program ("IEP") is "a written statement that 'sets out the

child's present educational performance, establishes annual and short-term objectives for

improvements in that performance, and describes the specially designed instruction and

services that will enable the child to meet those objectives.'" *M.H.*, 685 F.3d at 224

(quoting *D.D. ex rel. V.D. v. N.Y.C. Bd. of Educ.*, 465 F.3d 503, 507–08 (2d Cir.2006)).

Under the IDEA, a child's IEP will be deemed appropriate only if it is "likely to produce

progress, not regression," and the IEP "[must] . . . afford[] the student with an

opportunity greater than mere trivial advancement." *Id.* (alterations in original) (quoting

*T.P. ex rel. S.P. v. Mamaroneck Union Free Sch. Dist.*, 554 F.3d 247, 254 (2d

Cir.2009)).

28.     School districts must offer the child a public school placement that is able to implement

the child's IEP in order to meet their obligation to provide the child with a FAPE. *See*

*M.H.*, 685 F.3d at 223; *see generally B.R. ex rel. K.O. v. New York City Dep't of Educ.*,

910 F. Supp. 2d 670 (S.D.N.Y. 2012).

29.     If a parent disagrees with a student's IEP or school placement, the parent has a right

under the IDEA to request a due process hearing.  At the due process, or impartial

hearing, the parent can challenge the DOE's failure to provide the student with a FAPE

by challenging the student's recommended *program—i.e.*, the student's IEP—or the

student's actual or proposed school *placement—i.e.*., the actual school and classroom

recommended for the student—or both.  20 U.S.C. § 1415(f); 34 C.F.R. §§ 300.507,

300.153.

**When the DOE Fails to Provide a FAPE, the DOE Must Pay For That Student's Receipt of**
**An Appropriate Private Education**

30.     If the DOE fails to provide a student with a disability with a FAPE, the parent is entitled

to unilaterally place his or her child in an appropriate private school and seek tuition

payment for the private school from the DOE through an impartial hearing.  20 U.S.C. §

1415(f); N.Y. Educ. Law § 4404(1).  Once the impartial hearing officer renders a

decision, both the parent and the DOE have the right to appeal that decision to the Sate

Review Officer.  N.Y. Educ. Law § 4404(2).  The parent and the DOE have the right to

appeal the SRO's decision to a federal court.  20 U.S.C. § 1415(i)(2)(A).

31.     In evaluating a tuition payment claim under the IDEA, the court first considers whether

the school district provided the student with a FAPE.  *School Comm. of Town of*

*Burlington, Mass. v. Dep't of Educ.*, 471 U.S. 359, 368-74 (1985); *M.H.*, 685 F.3d at

9

245; *Mr. & Mrs. A. ex rel. D.A. v. N.Y.C. Dep't of Educ.*, 769 F. Supp. 2d 403, 408

(S.D.N.Y. 2011). In conducting this analysis, the court first looks at whether the State

complied with the IDEA's procedural requirements as well as whether the IEP

developed is "reasonably calculated to enable the child to receive educational benefits."

*Id.* (quoting *Frank G. v. Bd. of Educ. of Hyde Park*, 459 F.3d 356, 364 (2d Cir. 2006)).

"The IEP must offer special education and related services commensurate with each

child's need...." *F.O. v. N.Y.C. Dep't of Educ.,* 976 F. Supp. 2d 499, 505 (S.D.N.Y.

2013) (citation omitted).

32.     The court must also look at whether the placement that the school district offered was

appropriate to meet the student's needs. *D.C. ex rel. E.B. v. N.Y.C. Dep't. of Educ.*, 950

F. Supp. 2d 494, 509 (S.D.N.Y. 2013) ("[D]esigning an appropriate IEP in accordance

with the procedural and substantive requirements of the IDEA is only the first step.

'[The Department] must also implement the IEP, which includes offering placement in a

school that can fulfill the requirements set forth in the IEP.'" (quoting *O.O. v. District of

Columbia*, 573 F. Supp. 2d 41, 53 (D.D.C. 2008))).

33.     Under New York Education Law, the DOE has the burden to prove that it offered the

student a FAPE, both with regard to the IEP and the offered placement. N.Y. Educ. Law

§ 4404(1)(c).

34.     If the Court finds that the school district denied the student a FAPE, the court then asks

whether the private schooling obtained by the parent is appropriate for the child's needs.

*Id.* In this second step of the analysis, the burden shifts from the school district to the

parent to demonstrate the appropriateness of the school in which the parent has enrolled

his or her child. *M.H.*, 685 F.3d at 246. The private placement, however, need not meet

the IDEA definition of a FAPE. *F.O.*, 976 F. Supp. 2d at 521.

35.    Finally, the court will consider equitable factors relating to the reasonableness of the

parent's unilateral placement. *M.H.*, 685 F.3d at 245. In conducting this analysis, the

court enjoys broad discretion and must consider all relevant factors, including whether

the parent cooperated with the DOE throughout the process. *D.C.*, 950 F. Supp. 2d at

515.

**Standard of Review**

36.    On appeal from a decision of the SRO, the district court should undertake an

"independent" review of the administrative record. *Walczak v. Fla. Union Free Sch.*

*Dist.*, 142 F.3d 119, 129 (2d Cir. 1998). While the court should give "due weight" to

findings made in the course of administrative proceedings, a federal court may not

simply "rubber stamp" administrative decisions. *Id.* The degree of deference the court

should give to the state administrative decision turns on the thoroughness of the decision

and adherence to legal standards. *F.O.*, 976 F. Supp. 2d at 511-12.

37.    When the two administrative decisions—those of the SRO and the IHO—disagree, the

court should "defer to the SRO's decision on matters requiring educational expertise

unless it concludes that the decision was inadequately reasoned, in which case a better-

reasoned IHO opinion may be considered instead." *Id.* (quoting *R.E.*, 694 F.3d at 189)

(internal quotation marks omitted); *see also M.H.*, 685 F.3d at 246 ("[W]hen . . . the

district court appropriately concludes that the SRO's determinations are insufficiently

reasoned to merit [that] deference, and in particular where the SRO rejects a more

11

thorough and carefully considered decision of an IHO, it is entirely appropriate for the court . . . to consider the IHO's analysis..."); *Jennifer D. ex rel. Travis D. v. N.Y.C. Dep't of Educ.*, 550 F. Supp. 2d 420 (S.D.N.Y. 2008) (relying on the decision of the IHO, and rejecting that of the SRO, because of the SRO's failure to make adequate factual findings).

## FACTUAL ALLEGATIONS

38.    Q.W.H. has qualified for special education services since she was a young child. Ex. 6-2. She received Early Intervention and preschool special education services including speech, occupational therapy, physical therapy and counseling. *Id.*; Tr. 169. When she transitioned into kindergarten in September 2006, she was classified as speech and language impaired and was placed in a 12:1:1 class with twelve students, one teacher and one paraprofessional. *See* Tr. 169-70, Ex. D-1.

39.    Q.W.H. struggled in the 12:1:1 setting. According to her first grade IEP in December 2007, Q.W.H. could read only a few basic sight words and her goals started with the basic objective of reading the pictures in a story. Ex. D-3, 9-10. Q.W.H. had to repeat the second grade. Tr. 170-71; Ex. I-1.

40.    In December 2009, during her second year in second grade, Ms. W. requested new evaluations and a new placement for Q.W.H., because she was concerned that her academic and behavioral needs were not being addressed. Ex. H-1; Tr. 171-72. The new evaluations showed that Q.W.H. had made little progress since she began school more than three years earlier, stating that she could only "read a few words." Ex. J-2.

41.   The IEP developed in December 2009 listed as short-term objectives that, "Q.W.H. will read the pictures in a story," and "Q.W.H. will recognize the sight words and, is, the...," indicating no progress in reading since her 2007 IEP. Ex. B-7.

42.   Q.W.H. remained in the inappropriate 12:1:1 setting for the 2009-2010 school year. *See* Ex. B-1.

43.   Q.W.H.'s lack of progress affected her self-esteem: she lacked self-confidence and felt insecure about her learning disabilities. Ex. C-4; J-2.

44.   Q.W.H. also experienced significant behavioral challenges in the 12:1:1 class setting, including throwing chairs, pinching teachers, becoming disruptive and oppositional, hitting other children, and becoming aggressive toward adults. Tr. 170, Ex. D-6, 7, 18; Tr. 170. Ms. W. was frequently called by the school to pick up Q.W.H. Tr. 170-71.

45.   In September 2010, after Q.W.H. had spent four years in inappropriate 12:1:1 classes, Ms. W. enrolled Q.W.H. at Cooke. Tr. 175.

46.   Q.W.H. was evaluated in November 2010 by the Center for Attention and Learning Disorders at Lenox Hill Hospital. *See* Ex. 6. According to that report, Q.W.H.'s overall intellectual functioning is in the Extremely Low range. Ex. 6-4. She struggles with abstract concepts and has difficulty with receptive language. Ex. 6-5 & 12. Q.W.H. also exhibited difficulty with some executive functioning and adaptive skills and demonstrated significant delays in all academic areas. Ex. 6-10 & 13.

47.   Q.W.H. was diagnosed with Mixed Receptive and Expressive Language Disorder, Attention Deficit/Hyperactivity Disorder Inattentive Type, Adjustment Disorder with

Depressed Mood, and Mild Mental Retardation. Ex. 6-14. The evaluator found that Q.W.H. required intensive, individualized support and recommended a small specialized classroom setting in an educational program that also focuses on building adaptive living skills and offers counseling and social skills training, speech and language therapy, and active, hands-on, experiential learning opportunities that promote peer interaction. Ex. 6-14, 15.

48. Q.W.H. attended Cooke during the 2010-2011 and 2011-2012 school years, in a 12:2 class with twelve students and two teachers, through DOE funding. Ex. 1-3.

49. Since she began attending Cooke, Q.W.H. has made significant progress in her academic and social-emotional skills. She began to read independently, gained confidence in her reading and writing abilities, and made improvements in her development of number sense, geometry, measurement, and math operations. Ex. F-9; Tr. 157-58. She no longer exhibited many of the disruptive or oppositional behaviors she did previously, and she needed less intensive behavioral supports. Tr. 159-60; 177; Ex. F-18.

### The 2012-2013 IEP

50. On February 28, 2012, the CSE developed an IEP for Q.W.H. for the 2012-2013 school year. Tr. 33; Ex. 7. At that time, Q.W.H.'s reading comprehension was at a first grade level, and her math skills were at an early second grade level. Ex. 7-1. The CSE classified Q.W.H. as intellectually disabled, provided for a twelve month school year, set her promotion criteria as alternate assessment, and recommended a 12:1:1 class setting. Tr. 43, Ex. 7-9, 10. The 2012-2013 IEP does not call for small group instruction even

though all of the reports considered at the IEP meeting indicated that she needed small group instruction and individualized support. *See* Tr. 67; Ex. 4-3 to 6; Ex. 6-14.

51.   The 12:1:1 program with no small group instruction recommended by the DOE does not provide sufficient direct teacher instruction for Q.W.H., and is substantially similar to the program that Q.W.H. attended during her first four years of elementary school, in which she did not make academic progress, experienced significant behavioral challenges, and had to repeat the second grade.

52.   At Cooke, by contrast, where Q.W.H. received instruction in a 12:2 setting (*i.e.*, two teachers, as opposed to a teacher and a paraprofessional, for twelve students), and small group instruction in a number of subjects, she made significant progress in her academic and social-emotional skills. Tr. at 76.

53.   Q.W.H.'s math teacher at Cooke testified that the second teacher in the classroom had "a big impact on [Q.W.H.'s] success in the classroom." Tr. 130-31. Mr. Woolridge, Q.W.H.'s Humanities teacher stated that the extra teacher support is "very much needed" and questioned if Q.W.H. would be able to function without the second teacher, suspecting that she might regress and again display the behaviors she had when she first came to Cooke. Tr. 161.

54.   Given Q.W.H.'s lack of progress over many years in a 12:1:1 setting, and her subsequent progress in Cooke's more supportive classroom environment with small group instruction, the DOE's recommendation of another 12:1:1 placement for Q.W.H. during the 2012-2013 school year was inappropriate and, therefore, denied Q.W.H. a FAPE.

### The 2012-2013 Placement Recommendations

55. The CSE did not recommend a school placement for Q.W.H. for the 2012-2013 school year at the IEP Meeting on February 28, 2012. *See* Ex. 5.

56. In early June 2012, Ms. W. and her children moved from their home in the Bronx to a domestic violence shelter in Brooklyn. Tr. 196-97; Ex. R-1. On June 15, 2012, Ms. W. notified the CSE of her new address. Tr. 196; Ex. R-1.

57. After she moved, Ms. W. received a Final Notice of Recommendation ("FNR") for the 2012-2013 school year, dated June 13, 2012, at her old address in the Bronx. Ex. 9-1; Tr. 208. The recommended school was located in the Bronx, far from where she and Q.W.H. were residing in Brooklyn. Ex. 9-1.

58. Upon receiving the FNR, Ms. W. and her attorney informed the placement officer of the family's living situation, and asked to defer a decision on placement until the family was permanently housed. *See* Tr. 182; Ex. O-1. At that time, Ms. W. did not believe that she could return to the Bronx. Tr. 188. Q.W.H. did not attend school anywhere during the summer of 2012. Tr. 194, 196-97.

59. On August 24, 2012, Ms. W. notified the CSE through her attorney that the family was still living in a shelter in Brooklyn, and requested that the DOE offer Q.W.H. a placement in Brooklyn for the 2012-2013 school year. Ex. P. Ms. W. also notified the DOE that she had reservations about the recommended program and, unless she received an appropriate placement for Q.W.H., she would unilaterally enroll her at Cooke for the 2012-2013 school year. Ex. P.

60. On August 27, 2012, the CSE issued a placement offer for P373K @ the Brooklyn
Transition Center. Ex. N. Ms. W. spoke to the principal at P373K and arranged to visit
the placement on the second day of school. Tr. 183.

61. On September 7, 2012, Ms. W. visited the Brooklyn Transition Center. When she
arrived, she spoke to the School Representative—a school employee who may have
been an Assistant Principal, but was likely a guidance counselor or administrator—and
gave the School Representative the FNR that she had received for Q.W.H. *See id.* at
183, 200, 214.

62. The School Representative told her that Q.W.H. was not on the roster, but that there was
only one class for sixth graders in the school. *Id.* at 183-84. The rest of the school was
a high school. *Id.* at 185.

63. The School Representative told Ms. W. that the academic levels of the students in the
class were between a first and seventh grade level. *Id.* at 185. Ms. W. was also told that
the paraprofessionals teach the students in small groups. *Id.* at 202. Ms. W. was not
permitted to enter the classroom or speak to the teacher. *Id.* at 184-85.

64. Based on information provided by the school to Ms. W. during her visit, Ms. W.
determined that the school was not appropriate for Q.W.H. Tr. 186-87. In particular,
Ms. W. was concerned that the majority of the students in the school were much older
than Q.W.H., that the academic range of the students in the class was not appropriate for
Q.W.H., and that teachers were not teaching the students the class. Tr. 183-87. As a
result, Q.W.H. began attending Cooke on September 10, 2012 and, on September 18,
2012, Ms. W. notified the CSE herself and through her attorney that she was rejecting

the public school placement because, among other things: (1) the school was largely a high school; (2) the academic levels of the students were higher than Q.W.H.'s; and (3) she was told that much of the students' instructional time is with paraprofessionals. Tr. 185-86; Ex. L.

65.   Ms. W. did not receive a response from the DOE.

66.   On September 4, 2012, Ms. W. signed an enrollment contract with Cooke (the "Cooke Contract") in order to hold a space for Q.W.H. in case the public school placement was not appropriate. Ex. M. The Cooke Contract specifically allowed the parent to withdraw Q.W.H. without financial penalty, prior to October 31, 2012, if the DOE offered Q.W.H. an appropriate placement:

> I acknowledge that I will be released from this contract without financial penalty or continuing responsibility for tuition payments under this enrollment contract should I choose to accept a school placement recommended by the New York City Department of Education in a public school or a New York State approved provider of special education.

Ex. M.

67.   The DOE did not respond to Ms. W.'s concerns about the placement at P373K or offer Ms. W. another placement for the 2012-2013 school year.

### Impartial Hearing Process

68.   On December 18, 2012, Ms. W. filed a request for an impartial hearing seeking an order that the DOE directly fund Q.W.H.'s tuition at Cooke for the 2012-2013 school year because the DOE denied Q.W.H. a FAPE. Ex. 1.

69.   In her impartial hearing request, Ms. W. reiterated that a 12:1:1 program would not
      provide sufficient social, emotional or academic support for Q.W.H. Ex. 1. Ms. W.
      again set forth the reasons why she believed the placement at P373K was inappropriate
      for Q.W.H. *Id.*

70.   The DOE filed its response to the impartial hearing request on January 7, 2013, well
      after the ten-day deadline for the response set forth in the IDEA. Ex. 2; *see also* 20
      U.S.C. 1415(c)(2)(B)(i)(II).

71.   In its response, the DOE did not address any of Ms. W.'s concerns about the program or
      placement other than to state generally that "this placement is reasonably calculated to
      enable the child to obtain meaningful educational benefits." Ex. 2. The DOE also did
      not provide any additional information to Ms. W. about the program or placement
      during the resolution period or contact the parent or her attorney to schedule a resolution
      meeting.

72.   A prehearing conference was held on January 23, 2013. The DOE did not appear.

73.   The impartial hearing was held on February 27, 2013. During the hearing, the DOE
      called one witness who testified only about the IEP created for Q.W.H. for the 2012-
      2013 school year. *See* Tr. at 30-70.

74.   The Department did not offer any direct testimony in support of the placement at
      P373K, and instead argued that "the parent has not set forth any allegations related to the
      placement that the Department is legally obligated to prove or disprove." Tr. at 27-28.

75.     After the close of the parent's case, the DOE called Mr. Greenidge, an Assistant
        Principal at P373K as a "rebuttal witness." *Id.* at 210-11. Mr. Greenidge did not offer
        any testimony about the program or services offered in the class specified in Q.W.H.'s
        FNR, how many students were in the class, or whether the school, in fact had a 12:1:1
        sixth grade class. *See* Tr. at 209-17.

76.     Instead, Mr. Greenidge testified that there is one junior high school class at P373K. *Id.*
        at 212. He could not provide any specific information about the class, stating instead
        that the academic range of the students in the class is likely "typical of many of [the]
        students [in the school], who range from pre-K to third grade," and that a teacher teaches
        the class. *See id.* at 212-13.

77.     Mr. Greenidge also testified that he only occasionally gives tours to prospective
        students, that he has no recollection of giving a tour to Ms. W. and that typically
        guidance counselors or administrators give the tours. Tr. 214.

78.     On April 3, 2013, the IHO issued a decision holding that "the DOE failed to provide the
        student with FAPE for the 2012-13 school year based on the failure of the DOE to offer
        an appropriate placement." IHO Dec. at 7.

79.     The hearing officer further found that Ms. W. had met her burden of showing that Cooke
        was appropriate for Q.W.H., and that the equities favored the parent. *Id.* at 8-9. In
        coming to her decision, the IHO specifically credited the testimony of Ms. W. and the
        Cooke staff, which demonstrated that Q.W.H. was progressing socially, emotionally and
        academically. *Id.* at 8. She also found that Ms. W. "cooperated fully with the IEP
        process" and "fully complied with the CSE." *Id.* at 9-10.

## Appeal to the State Review Officer

80. On May 8, 2013, the Department appealed the decision of the IHO arguing that "the IHO erred in finding that the DOE failed to offer Q.W.[H.] a FAPE for the 2012-2013 school year" because "the CSE team developed an IEP that recommended an appropriate program and addressed the Student's needs." Verified Petition ¶ 5.

81. The DOE did not challenge the IHO's finding that Cooke was an appropriate placement for Q.W.H.

82. On June 3, 2013, Ms. W. filed a Verified Answer and Petition to Cross-Appeal arguing that the IHO's findings that the DOE failed to offer Q.W.H. an appropriate placement for the 2012-2013 school year, that Cooke was an appropriate placement for Q.W.H., and that the equities favored Ms. W., were correct, but that the IHO erred in finding that Q.W.H.'s IEP was appropriate. *See* Verified Answer and Petition to Cross-Appeal.

83. On November 12, 2014, seventeen months after the appeal was fully briefed, the SRO issued a decision finding that the proposed 12:1:1 program and the placement at P373K were appropriate, and overturning the IHO's order of tuition payment for Cooke for the 2012-2013 school year. SRO Decision at 9-10. Having found that the DOE offered Q.W.H. a FAPE, the SRO did not "reach the issue of whether equitable considerations weighed in favor of the parents' [*sic*] request for relief." *Id.* at 9. Finally, since the DOE did not challenge the IHO's finding that Cooke was an appropriate placement, the SRO did not review that issue. *Id.* at 4.

84.   Through this appeal, plaintiff asserts that the SRO committed errors of law requiring the

SRO's decision to be overturned and the IHO's decision on the DOE's denial of a FAPE

and order of tuition be reinstated.

### The IHO Was Correct In Finding That The DOE Failed to Offer Q.W.H. an Appropriate School Placement

85.   During Ms. W.'s visit to the school in September 2012, the School Representative told

Ms. W. that the class for sixth graders at P373K contained students whose academic

levels ranged from first to seventh grade levels. Tr. 185. The School Representative

also told Ms. W. that there was only one class designed for sixth graders in the school

and that the remainder of the classes were high school classes, and that

paraprofessionals, rather than teachers, did most of the teaching in the class. *See id.* at

185, 202-03.

86.   The DOE did not dispute these statements after Ms. W. informed the DOE of her

concerns in her letter dated September 18, 2012, nor did they dispute them in their

response to the impartial hearing request, other than to state generally that the placement

was appropriate. The DOE did not engage in the resolution process prior to the hearing,

nor did it attend the pre-hearing conference before the IHO.

87.   During the hearing, the DOE did not put on any evidence that the placement was

appropriate, other than to call a rebuttal witness who stated only that there was one

junior high school class in the school and that he thought the range of students in that

class "is typical of many of our students, who range from pre-K to third grade." There

was no testimony that the school in fact had a 12:1:1 sixth grade class. Tr. 212-14.

88.    The six year academic range described to Ms. W. during her visit to P373K greatly

exceeds the recommended range in the state regulations for students with disabilities.

*See* 8 N.Y.C.R.R. §200.6(h)(2)-(7).  The six year range going up to a seventh grade level

was particularly inappropriate for Q.W.H. whose IEP stated that her reading

comprehension was at a first grade level and her math skills were at an early second

grade level.

89.    Similarly, the fact that the school was largely a high school made the placement

inappropriate for Q.W.H., an eleven year old who lacked self-confidence and who would

have been one of the youngest students in the school.

90.    Finally, Q.W.H.'s evaluations and reports from Cooke made it clear that Q.W.H. needed

intensive teacher support, and, therefore, a class largely taught by paraprofessionals,

rather than teachers, was not appropriate for her.

91.    For the foregoing reasons, the IHO's reasoned finding that the placement at P373K was

not appropriate for Q.W.H. should be upheld.

**The Evidence Concerning the Inappropriateness of the Placement was not Speculative**

92.    The SRO erred in finding that Ms. W.'s contention that the DOE could not implement

Q.W.H.'s IEP or meet Q.W.H.'s needs at P373K was speculative and, therefore, could

not form the basis for finding that the DOE denied Q.W.H. a FAPE.

93.    By finding that a parent cannot challenge the adequacy of a school placement if the

student did not attend the proposed placement, the SRO confused the Second Circuit's

holding in *R.E. v. New York City Dep't of Educ.*, 694 F.3d 167 (2d Cir. 2012).  In that

case, the Second Circuit held that a school district may not rely on "retrospective testimony, '*i.e.*, testimony that certain services not listed in the IEP would actually have been provided to the child if he or she had attended the school district's proposed placement'" to show that the school district would have provided the student with a FAPE, when the IEP itself fell short of providing an appropriate program. *Id.* at 185. The Court reached this conclusion because it would be unfair to require parents to make the decision to send their child to a private school based on the school district's failure to design an appropriate program for the child, and then allow the school district to bolster the program set forth in the IEP through testimony at a later impartial hearing: "By requiring school districts to put their efforts into creating adequate IEPs at the outset, IDEA prevents a school district from effecting this type of 'bait and switch,' even if the baiting is done unintentionally. A school district cannot rehabilitate a deficient IEP after the fact." *Id.* at 186.

94.     In *R.E.*, the Second Circuit also stated that "*[s]peculation* that the school district will not adequately adhere to the IEP is not an appropriate basis for unilateral placement." *Id.* at 195 (emphasis added). There, the parents of one of the students at issue argued that the proposed school could not implement the student's IEP because "defendant's own internal documents show that a large percentage of students at P.S. M094 have been and continue to be 'underserved' for related services, particularly as to occupational therapy." *Id.* at 195. There was no evidence that the parents spoke to anyone at the school about the services that would actually be provided to their child. Instead, the parents relied on general speculation that their child would not have received appropriate services because other students had not received services in the past. The Court found

that this type of speculation could not defeat an otherwise adequate provision of FAPE. *Id.* at 195.

95. Here, Ms. W.'s testimony about the appropriateness of P373K was not speculative but was instead based on *what DOE personnel told her when she visited the school*. The School Representative told her there was only one class for sixth graders in the school and the rest of the school was a high school, that the academic levels of the students in the class were between a first and seventh grade level, and that *paraprofessionals* (as opposed to teachers) taught the students in small groups. Tr. at 183-85, 202.

96. Ms. W. notified that DOE by letter that she was rejecting the placement for these reasons. Tr. 187-88; Ex. L. The DOE *did not respond* to this letter, and took no action to correct any of Ms. W.'s descriptions or concerns about the placement.

97. Ms. W. again relayed this information about the proposed placement in her impartial hearing request. Ex. 1. In its response, the DOE did not address or correct any of Ms. W.'s concerns about the placement, other than to state generally that "this placement is reasonably calculated to enable the child to obtain meaningful educational benefits." Ex. 2. The DOE never informed Ms. W. that she was given erroneous information when she visited the school.

98. Ms. W. relied on the DOE's statements during her visit to P373K and lack of further information following her letter to the DOE stating her reasons for rejecting the placement.

99.   Ms. W.'s reliance of the information provided by the DOE is exactly the type of

information that parents can and should rely on when assessing a placement, and it is in

no way speculative under the Second Circuit's holding in *R.E. See also D.C. v. New

York City Dep't of Educ.*, 950 F. Supp. 2d 494, 510 (S.D.N.Y. 2013) ("At the time the

parent must decide whether to accept the proposed placement or unilaterally place a

student elsewhere, the only information available to the parent about the proposed

placement are the [Final Notice of Recommendation] and, if the parent visited the

proposed placement, the information provided during that visit. The information a

parent can glean from these two sources creates considerable reliance interests because

the parent must decide, based solely on this information, whether to take the financial

risk of unilateral placement.").

100.  The SRO's concern that it would be "unfair" to the school district to allow the parent to

rely on information that post-dates the IEP is baseless. Ms. W. relied on information

provided to her *by the school* and she gave the school district an opportunity to dispute

that information by providing a letter detailing her reasons for rejecting P373K. There is

nothing unfair about Ms. W. then relying on the same information at a later impartial

hearing to show why the placement was not appropriate. This is a far cry from the

Second Circuit's concern in *R.E.* that a school district not be permitted to rely on

information that was *never* provided to the parent, and that was *not* included in the IEP,

to defeat a claim that the IEP was deficient. *See Scott ex rel. C.S. v. New York City

Dep't of Educ.*, 6 F. Supp. 3d 424, 444 (S.D.N.Y. 2014) ("Plaintiff may challenge C.S.'s

placement as inappropriate 'if the alleged defects were reasonably apparent to either the

parent or the school district when the parent rejected the placement,' regardless of

whether Plaintiff ever actually enrolled C.S. at P373K.") (citations omitted).

### The SRO's Unsupported Finding That P373K Was An Appropriate Placement Should Not Be Given Deference

101.   As set forth above, the IHO found that the placement could not meet Q.W.H.'s needs

because the IHO credited Ms. W.'s testimony describing the placement and what the

School Representative told her about the school.   The IHO also noted that "[t]he DOE

offered no direct testimony about the actual recommended placement which was offered

to the student or that the said placement would be able to implement the IEP" and that

the only testimony offered by the DOE was a very brief rebuttal by Assistant Principal

Greenidge in which he testified that, in general, "the teacher teaches the class and the

paraprofessionals assist the teacher" but could not even confirm "that the school in fact

had a 12:1:1 6th grade class." *Id.* at 7.

102.   Instead of discussing the IHO's analysis or engaging in any independent analysis, the

SRO simply concluded, *without any discussion whatsoever*, that "the evidence in the

hearing record does not support the conclusion that the district would have violated the

FAPE legal standard related to IEP implementation—that is, that the district would have

deviated from the student's IEP in a material or substantial way." SRO Dec. at 9.

103.   Because the SRO undertook no analysis in reaching its conclusion, the Court should not

give any deference to the SRO's finding.   Instead, the Court should defer to the well-

reasoned finding of the IHO that the school placement was not appropriate for Q.W.H.,

and should reinstate the IHO's order of direct funding of Q.W.H.'s tuition at Cooke for

the 2012-2013 school year. *R.E.*, 694 F.3d at 189 ("a court must defer to the SRO's

decision on matters requiring educational expertise unless it concludes that the decision was inadequately reasoned, in which case a better-reasoned IHO opinion may be considered instead."); *M.H. v. N.Y.C. Dep't of Educ.*, 685 F.3d 217 (2d Cir. 2012) (the district court should defer to the IHO where "the SRO's determinations are insufficiently reasoned to merit that deference...."); *Scott*, 6 F. Supp. 3d at 441 ("The SRO's conclusion that C.S. would have been offered an adequate placement . . . made without consideration of Plaintiffs' highly significant testimony, is precisely the type of determination to which courts need not defer, particularly when the evidence has been carefully considered and found persuasive by an IHO.") (internal quotations and citations omitted).

### To The Extent The SRO Relied on Assistant Principal Greenidge's Testimony, That Reliance Was Improper

104. To the extent that the SRO credited the testimony of Assistant Principal Greenidge—a conclusion that is not at all clear from the SRO's decision—that testimony should be disregarded as it is the exact type of "bait and switch" forbidden by the Second Circuit.

105. During the school visit, the School Representative told Ms. W. that the students in the class ranged from a first grade to a seventh grade level and that paraprofessionals, rather than teachers, taught the class. At the hearing, Assistant Principal Greenidge, who did not believe he met Ms. W. when she visited the school, stated that he thought the students in the class were similar to other students in the school whose abilities ranged from a pre-K to third grade level, and that teachers, rather than paraprofessionals, taught the class.

106.   Ms. W. visited the proposed school placement, relied on the statements made by DOE personnel in deciding to reject the placement and keep her child at Cooke, communicated her decision and her concerns about the placement to the DOE, heard nothing further from the DOE, and, as a result, decided to keep her child at Cooke beyond the deadline for withdrawing her without financial penalty. The DOE cannot later provide different, after-the-fact testimony at an impartial hearing to defeat the parent's claim for tuition payment when it withheld such information from the parent during the parent's visit to the school, after it received the parent's letter explaining her reasons for rejecting the placement and in responding to the parent's due process request. *R.E.*, 694 F.3d at 186 ("[the] IDEA prevents a school district from effecting this type of 'bait and switch....'"); *D.C.*, 950 F. Supp. 2d at 510-11 ("[u]nder the approach advocated by the Department, the Department could propose a placement that was not prepared to implement the IEP, leading a parent justifiably to place the child unilaterally. However, the Department could defeat the parent's subsequent reimbursement claim by introducing evidence that the proposed placement hypothetically could have effected changes to implement the IEP. This would result in the same 'bait and switch' that the Court of Appeals condemned in *R.E.*"); *B.R.*, 910 F. Supp. 2d at 677 ("the Court evaluates whether, at the time B.R. was actually considering the proposed placement, the school could offer occupational therapy in line with the IEP.").

## A 12:1:1 Program Was Inappropriate for Q.W.H.

107.   The SRO's finding that a 12:1:1 program was appropriate for Q.W.H. was in error.

108.  In finding that the 12:1:1 program recommendation was appropriate, the SRO
erroneously equated the 12:2 program at Cooke (twelve students to two teachers) with a
12:1:1 program that consists of twelve students, one teacher and a paraprofessional.
SRO Decision at 2 ("the testimony of Cooke's head of school supports a finding that the
student was in a program which functioned, for all intents and purposes, as a 12:1+1
classroom.  Specifically, Cooke's head of school stated that all of the classrooms
are...staffed with a head teacher and a teaching assistant.").  But this conclusion
contradicts the record.  The record shows that the second teacher at Cooke was a full-
fledged teacher with a Bachelor's degree and, often, a Master's degree, and *not* a
paraprofessional, who often has only a high school diploma.  Tr. 74; *see also* Tr. 91 (the
assistant teacher in Q.W.H.'s humanities class, which includes English language arts and
social studies has a Master's in special education), 108-09 (the assistant teacher in
Q.W.H.'s math class has a Master's degree in mental health counseling); http://schools.
nyc.gov/NR/rdonlyres/ 75E78F82-887C-4C76-BD26-1B8F8424FC07/0/Substitute
ParaprofessionalHandbook 2012.pdf (setting forth qualifications for paraprofessionals).

109.  It is undisputed that Q.W.H. did not make meaningful progress in a class with twelve
students, a teacher and a paraprofessional, and that she only began to make progress
when she moved to a class with two teachers.  As such, the SRO was wrong to equate
the DOE's offered 12:1:1 program with the 12:2 program in which Q.W.H. made
progress.

110.  Accordingly, the SRO's finding as to the appropriateness of a 12:1:1 class for Q.W.H.
for the 2012-2013 school year should be overturned.

**The IHO's Determination That Cooke Is Appropriate Is Final**

111. The DOE did not appeal the IHO's finding that Cooke was appropriate in its petition to the SRO. As such, that decision is final. SRO Dec. at 4 (citing 34 C.F.R. 300.514[a]; 8 NYCRR 200.5[j][5][v]).

**The IHO's Determination That The Equities Favor The Parent Should Be Upheld**

112. As set forth above, the SRO did not reach the issue of whether the equities favored Ms. W.'s claim for tuition reimbursement. Because the IHO's determination that "the equities favor the position of the Parent" was well reasoned, the Court should defer to that finding.

113. Ms. W. cooperated with the DOE in all aspects of the special education process. She attended the IEP meeting in February, she informed the DOE of her change of address and asked the DOE to defer offering a placement until August, she sent the DOE a notice on August 24, 2012 asking for a school placement in Brooklyn, and stating that she intended to enroll Q.W.H. at Cooke *if* the DOE did not provide Q.W.H. with an appropriate placement, she visited the proposed placement at P373K, and she notified the DOE of her concerns about P373K in a letter to the DOE shortly after her visit.

114. By contrast, the DOE never responded to Ms. W.'s September 18 letter. And, when Ms. W. again notified the DOE of her concerns about P373K in her impartial hearing request, the DOE never responded to her concerns other than to state generically in its due process response that the "placement is reasonable calculated to enable the child to obtain meaningful educational benefits." Ex. 2. The DOE did not try to correct Ms.

31

W.'s concerns about the recommended placement during the resolution period and, in fact, failed to hold the statutorily mandated resolution meeting. The DOE also failed to appear at the prehearing conference before the hearing officer.

115. Based on the foregoing, the IHO was correct to find that the equities favored Ms. W., and that finding should be upheld by this Court.

116. Accordingly, this Court should reinstate the IHO's decision ordering the DOE to pay the cost of Q.W.H.'s tuition at Cooke for the 2012-2013 school-year.

### First Claim for Relief

### (Violation of the IDEA)

117. Plaintiffs repeat and reallege the allegations stated in paragraphs 1 through 116 as if fully set forth herein.

118. In violation of the IDEA, 20 U.S.C. § 1400 *et seq.*, the DOE denied Q.W.H. a FAPE from the 2012-2013 academic year. Such denial results from the inadequacies in the IEP and in the proposed placement, as described above.

119. Cooke is an appropriate placement, and the equities favor tuition payment here.

120. The IHO correctly determined that the DOE denied Q.W.H. a FAPE for the 2012-2013 school year. The SRO's decision should be reversed and the IHO's decision should be reinstated with respect to the tuition payment claim.

121. Because the DOE denied Q.W.H. FAPE for the 2012-2013 school year, the DOE should be ordered to pay the tuition for Q.W.H. to receive an appropriate education at Cooke.

## Second Claim for Relief

### (Violation of New York Education Law)

122. Plaintiffs repeat and reallege the allegations stated in paragraphs 1 through 121 as if fully set forth herein.

123. The DOE denied Q.W.H. a FAPE for the 2012-2013 academic year. Such denial results from the inadequacies in the IEP and in the proposed placement, as described above.

124. Defendants' failure to offer Q.W.H. an appropriate educational program or placement violated the rights of the plaintiff under New York State Education Law §§ 4401, 4402 4404 and 4410 and Part 200 of the Regulations of the New York State Commissioner of Education, 8 NYCRR § 200.

## PRAYER FOR RELIEF

125. Wherefore, Plaintiff respectfully requests this Court to:

   A.   reverse the SRO's decision of November 12, 2014;

   B.   reinstate the IHO's April 3, 2013 order that the DOE pay for Q.W.H.'s tuition at Cooke for the 2012-2013 school year;

   C.   order the DOE to make payment in the form of direct funding for the cost of tuition at Cooke for the 2012-2013 school year;

   D.   declare that Plaintiff is the substantially prevailing party for purposes of attorneys' fees; and

   E.   grant Plaintiff any additional relief as the Court deems appropriate.

Dated:  March 12, 2015
        New York, New York

                                        Respectfully submitted,


                                        Lucy S. McMillan, Esq.
                                        Arnold & Porter LLP
                                        399 Park Avenue
                                        New York, NY 10022
                                        (212) 715-1053


                                        Rebecca Shore, Esq.
                                        Advocates for Children of New York
                                        151 West 30th Street, 5th Floor
                                        New York, NY 10001
                                        (212) 947-9779