UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

Q.W.H., by her parent, L.W., and L.W.,     :
     :
          Plaintiffs-Appellants,     :
     :
     -against-     :
     :
NEW YORK CITY DEPARTMENT OF     :
EDUCATION, NEW YORK CITY BOARD OF     :
EDUCATION and CARMEN FARINA, in her     :
official capacity as Chancellor of the New York     :
City Department of Education,     :
     :
          Defendants-Appellees.  :

------------------------------------------------------------X

15-CV-1876 (VEC)

OPINION AND ORDER

VALERIE CAPRONI, United States District Judge:

This case is brought under the Individuals with Disabilities in Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*, by a parent, L.W., and child, Q.W.H., seeking reimbursement from the New York City Department of Education ("DOE") for the child's private school tuition. As this Court has expressed previously, the Court's heart goes out to the parent, who wants the very best for her disabled child. The Court does not begrudge the parent's desire to place her child in the school that she believes is best. But the law does not guarantee disabled children—or, for that matter, gifted or normally-talented children—the best education that money can buy. What it guarantees disabled children is a free and appropriate public education ("FAPE"). In this case, the parent unilaterally elected to enroll her child in private school. That was the parent's prerogative, but because the Plaintiffs have not demonstrated that Q.W.H. was denied a FAPE, their claim for tuition reimbursement is denied.

BACKGROUND[1]

## I.    Q.W.H.'s Background

Plaintiffs seek tuition reimbursement for the 2012-13 school year, during which Q.W.H. was enrolled at Cooke Center Grammar School ("Cooke"), as she had been for several prior years.  At that time, Q.W.H. was eleven years old and entering the sixth grade.  Ex. 7 at 1.[2]  She has been classified as having an "Intellectual Disability" and has been diagnosed with Attention Deficit Hyperactivity Disorder ("ADHD"), mixed receptive and expressive language disorder, and a seizure disorder.  Ex. 1 at 1.  As she was entering the 2012-13 school year, Q.W.H.'s reading comprehension was at a first grade level, listening comprehension at a third grade level, writing comprehension at a mid-first grade level, and math comprehension at an early second grade level.  Ex. 7 at 1.

## II.    The Committee on Special Education's 2012-13 IEP

On February 28, 2012, the DOE convened a Committee on Special Education ("CSE") to develop Q.W.H.'s Individualized Education Program ("IEP") for the 2012-13 year ("CSE meeting").  *See* Ex. 7; Tr. 33.  Present at the CSE meeting was a DOE school psychologist, who also served as the District Representative at the meeting (Nessan O'Sullivan),[3] a DOE special

---

[1]     The Court assumes that any reader of this opinion is familiar with this area of the law but will, nevertheless, offer the customary apology that this opinion is – like the briefs and the other opinions cited herein – "replete with acronyms." *M.H. v. N.Y. City Dep't of Educ.*, 685 F.3d 217, 223 n.1 (2d Cir. 2012).  A glossary of IDEA acronyms is attached as an appendix.  Moreover, because familiarity with the subject matter is presumed, this opinion will also dispense with the customary recitation of the statutory framework that applies.

[2]     Plaintiffs filed under seal a copy of the official administrative record from the New York State Education Department Office of State Review.  Unless otherwise specified, the exhibits cited herein are from the evidence admitted at the underlying impartial hearing before the impartial hearing officer ("IHO").  Plaintiffs' exhibits are marked with letters; DOE's exhibits are marked with numbers; and the IHO's exhibits are marked with roman numerals. Citations to the impartial hearing transcript are marked "Tr. --."  The Court cites to the April 3, 2013, Findings of Fact and Decision of Impartial Hearing Officer Jeanne M. Keefe, Esq., as "IHO Decision" and the State Review Officer's ("SRO") November 12, 2014, Decision No. 13-079 as "SRO Decision."

[3]     O'Sullivan had also participated in the development of Q.W.H's previous IEP.  Tr. 33.

education teacher/speech pathologist, Q.W.H.'s teacher from Cooke, a Cooke educational

coordinator, Plaintiffs' attorneys, a "parent member," and L.W. Ex. 7 at 17; Tr. 34-37.  To

develop the 2012-13 IEP, the CSE team considered evaluations of Q.W.H. and reports including:

progress reports provided by Cooke, Ex. 4; a November 2010 Neuropsychological Evaluation,

Ex. 6; Q.W.H.'s previous IEP, dated March 22, 2011, Ex. 5; and Q.W.H.'s cumulative folder,

which included many of Q.W.H.'s previous evaluations.  *See generally* Tr. 37-44.

The 2012-13 IEP recommended a Special Education Classroom with a "12:1+1" staffing

ratio, as well as related services of Speech-Language Therapy, Occupational Therapy, and

Individual and Group Counseling Services.  Ex. 7 at 9-10.[4]  The 2012-13 IEP did not recommend

a specific school placement but did recommend placement for twelve months at a "NYC DOE

Specialized School," otherwise known as a District 75 school.  Ex. 7 at 13; Tr. 61-62.[5]

## III.    Placement at P373K

On August 27, 2012, the DOE issued a Final Notice of Recommendation ("FNR")

placing Q.W.H. at P373K @ Brooklyn Transition Center in Brooklyn, New York ("P373K").

Ex. N.[6]  The FNR stated that the program recommendation was for a "Special Class in a

Specialized School 12:1:1,"[7] and Related Services included "Speech, Occupational Individual,

---

[4]      In reaching that recommendation, the CSE team considered and rejected placement in a community school
as well as a 6:1:1 placement in a Special Class in a Specialized School.  Ex. 7 at 15.

[5]      A District 75 school "provides citywide educational, vocational, and behavior support programs for
students who are on the autism spectrum, have significant cognitive delays, are severely emotionally challenged,
sensory impaired and/or multiply disabled." *M.H.*, 685 F.3d at 234 n.9.  District 75 schools and programs are
located at more than 310 sites in New York City.  *See also* NYC DOE Website, *available at*
http://schools.nyc.gov/Academics/SpecialEducation/D75/Feeds/slider/AppropriateLearning
Environments.htm (last visited March 7, 2016).

[6]      The FNR issued on August 27, 2012 was the second FNR.  On June 13, 2012, DOE issued its first FNR
that assigned Q.W.H. to P188X @ I301X in the Bronx. Ex. 9; Tr. 181.  Because Plaintiffs had moved to Brooklyn,
Plaintiffs sought a placement in Brooklyn.  Tr. 181-82; Ex. O.

[7]      The terms "12:1+1" and "12:1:1" are used interchangeably in the record and the parties' briefs.
Accordingly, the Court also uses those terms interchangeably here.

Counseling, Counseling Individual." Ex. N. L.W. scheduled a visit at P373K on the second day

of the school year in September 2012 (which was the day suggested by the principal). Tr. 183;

Ex. L. She visited the school for about twenty minutes with a "coordinator" from Cooke. Tr.

184, 203. She testified that she met with an Assistant Principal whose name she could not

remember, Tr. 183-84, and brought a copy of the FNR with her to the visit. Tr. 200. L.W.

showed the Assistant Principal the FNR (reflecting that Q.W.H. required a 12:1:1 sixth grade

class), and he reported that Q.W.H. was not on the school's roster. Tr. 183-84, 200.

      The Assistant Principal told L.W. that P373K had only one class for sixth grade students,

Tr. 184. The building in which P373K is located is comprised of approximately twenty classes

located on four floors—one floor was a charter school and the rest of the school and classes,

other than the sixth grade, was a high school. Tr. 185, 200. L.W. testified that she was able to

observe the sixth grade class through the window of a closed door, but she was not permitted to

enter or speak to the teacher. Tr. 184-85. L.W. understood that, even though Q.W.H. was not on

the roster, this would have been Q.W.H.'s class because the school had only one sixth grade

class. Tr. 199-200. She observed eight students in the class, Tr. 198, and two adults (one teacher

and another adult whom L.W. believed to be a paraprofessional), Tr. 199. She could not

remember whether she was told the students' ages, Tr. 184, but testified that the Assistant

Principal told her that the students' academic levels ranged from first to seventh grade, Tr. 185,

201. Finally, she testified that the Assistant Principal told her that the occupational and physical

therapists were from outside the school and that the paraprofessional, not the teacher, would

teach students in small groups. Tr. 186, 202-03.

      On September 18, 2012, L.W. rejected the placement. Ex. L. The letter from her

attorney summarized her concerns, including that Q.W.H. "would be one of the youngest

children in the building with few peers" because the school is predominantly a high school;

Q.W.H. "would be one of the lowest functioning children in the school academically;" "the

reading program offered at P373 [would] not be supportive enough for [Q.W.H.]" because the

occupational therapists would be contracted from an outside agency and not regularly on site;

and much of the students' instruction time would be spent with paraprofessionals who did not

have the appropriate training to address Q.W.H.'s learning disabilities.  Ex. L.  L.W. raised no

concern that P373K did not actually have a sixth grade 12:1:1 class or that the class she saw had

too few students to be appropriate for her daughter.  L.W. proceeded unilaterally to enroll

Q.W.H. in Cooke for the 2012-13 school year.  Plaintiffs are now seeking reimbursement for

Q.W.H.'s tuition.

## IV.    The Administrative Proceedings

### A.       The Impartial Hearing

L.W. filed a due process challenge ("DPC") on December 18, 2012, requesting an

impartial hearing.  The DPC challenged the sufficiency of the 2012-13 IEP, specifically the

appropriateness of a 12:1:1 class size recommendation, Ex. 1 at 2,[8] and the appropriateness of

Q.W.H.'s placement in P373K, reiterating the concerns raised in the September 18, 2012 letter.

Ex. 1 at 3.  The DPC did not assert that P373K was an inappropriate placement because it did not

have a 12:1:1 sixth grade.

An impartial hearing was held before an IHO.  At the hearing, DOE presented testimony

from the DOE school psychologist who had attended the CSE Meeting, Tr. 30-70, and from

Roger Greenidge, the Assistant Principal at P373K.  Tr. 209-214.  Plaintiffs presented testimony

from L.W. and three representatives of Cooke.  Tr. 71-208.

---

[8]        The DPC raised additional challenges to the substance of the IEP that have been abandoned and are,
therefore, not relevant to this opinion.  Ex. 1 at 2.

At the hearing, the school psychologist testified that the CSE team "recommended a full-time special class with a staffing ratio of 12 students, one teacher, and one paraprofessional" because:

> We had information from a number of sources that [Q.W.H.] was responsive to adult redirection, and we had already indicated that that would be an important aspect of the classroom environment and management needs, and that would be one of the things picked up by the paraprofessional. We also had information . . . that she was in a small group setting at the time and . . . in the Cooke Center . . . some of her classroom functioning was in the classroom of 12, and none of the teachers, either in that particular classroom or in the smaller groupings had indicated that she had had significant challenges with the group size. So we felt that given her level of academic delay but also her lack of severe behavioral involvement that she would be able to make progress in that type of ratio and setting.

Tr. 60-61. The psychologist also explained that, although small group instruction was not specified in the IEP, a 12:1:1 class can allow for a certain amount of small group instruction. Tr. 67-70. There had been no objections at the CSE meeting to the 12:1:1 staffing ratio. Tr. 61, 67-68.[9]

L.W. testified about her visit to P373K and reiterated her concerns with the proposed placement, including:

> the fact that she's at [an] early reading level, early first grade reading level. One through seven just seems very broad, and also as far as like socially they was not really—they would just be self-contained really into they [sic] class. They wouldn't really have any . . . interactions with the rest of the school. For her, because she somehow fights for friends, that would not have really helped her to spread out or branch out.

Tr. 186-87.

---

[9]      Although the 2012-13 IEP stated: "Parent is in agreement with all aspects of the IEP," Ex. 7 at 15, L.W. testified at the impartial hearing that she did not remember agreeing to the IEP placement recommendation. Tr. 181. L.W. did testify, however, that she was present during the IEP Meeting when the 12:1:1 program recommendation was discussed, and although she and her attorneys were not asked their opinions of the staffing ratio, they did not object. Tr. 195.

During the DOE's rebuttal, Greenidge testified that he did not recall meeting L.W. when she visited the school.  Tr. 214.  Greenidge was asked about a 12:1:1 sixth grade classroom:

> MS. STEWART: First of all, we had some testimony about a sixth grade 12:1:1 classroom that's at your school. Does your school have that sort of classroom?
>
> MR. GREENIDGE: Twelfth Grade? [10]
>
> MS. STEWART: Sixth grade 12:1:1.
>
> MR. GREENIDGE: We have a junior high school – in our school.
>
> MS. STEWART:  And how many of those junior high classes do you have?
>
> MR. GREENIDGE: We have one junior high class.

Tr. 212.  He denied that the students in the junior high class were functioning at a first to seventh grade level, testifying that he thought "their range is typical of many of our students, who range from pre-K to third grade."  Tr. 212-13.  He denied that the paraprofessionals taught the class, indicating that "the teacher teaches the class" and the paraprofessionals "assist the teacher. They are part of the instructional team, and very often they split into groups that the paraprofessionals will work under the supervision of the teacher."  Tr. 213.

## B.      The IHO Decision

On April 3, 2013, the IHO issued Findings of Fact and Decision ("IHO Decision").  The IHO Decision concluded that "the IEP was both procedurally and substantively appropriate and was crafted to meet the individual education needs of the student."  IHO Decision at 7.  It further found that the school psychologist's testimony was "credible and not rebutted by the Parent."  *Id.* at 7.  The decision concluded, however, that the DOE failed to provide Q.W.H. with a FAPE because it failed to offer an appropriate placement.  *Id.* at 7-8.  The IHO noted that the DOE had "offered no direct testimony about the actual recommended placement which was offered to the

---

10      Mr. Greenidge testified by telephone and apparently did not hear the question.  *See* Tr. 1, 209.

student or that said placement would be able to implement the IEP." *Id.* at 7.  Moreover, the IHO concluded that the DOE's rebuttal witness testimony was inconclusive as to the placement's ability to implement the IEP and that the DOE had offered "no testimony that the school in fact had a 12:1:1 6th grade class" and "no evidence or testimony regarding the number of students actually enrolled in the class." *Id.* at 7-8.[11]

### C.    The SRO Decision

Both parties appealed the IHO's Decision to the SRO: the DOE appealed the finding that DOE failed to offer Q.W.H. a FAPE for the 2012-13 school year; Plaintiffs cross-appealed the determination that the IEP's recommendation of a 12:1:1 special class was procedurally and substantively appropriate.  SRO Decision at 1.

On November 12, 2014, the SRO issued her decision ("SRO Decision").  As to the IEP, the SRO held that "the February 2012 IEP, including the recommendation of a 12:1+1 special class, was both procedurally and substantively appropriate and was crafted to meet the individual educational needs of the student."  SRO Decision at 5 (internal quotation and citation omitted).

The SRO reversed the IHO's conclusion that the DOE had failed to offer a FAPE based on the recommended placement.  *Id.* at 6-9.  Relying on *R.E. v. N.Y. City Dep't of Educ.*, 694 F.3d 167 (2d Cir. 2012), the SRO found that a parent's challenges to an assigned public school are generally speculative and not an appropriate basis for unilateral placement when the student never attended the recommended placement.  SRO Decision at 7-8.  Citing a slew of cases, the SRO noted that "[w]hile some district courts have found that parents have a right to assess the adequacy of a particular school site to meet their children's needs, the weight of the relevant authority supports the approach taken here." *Id.* at 8 n.3.  The SRO further found that:

---

[11]     The IHO noted that the only available information was that L.W. observed eight students and two adults through the window of a classroom.  *Id.* at 8.

[E]ven assuming for the sake of argument that the parent could make such speculative claims or that the student had attended the district's recommended program at the assigned public school site, the evidence in the hearing record does not support the conclusion that the district would have violated the FAPE legal standard related to IEP implementation—that is, that the district would have deviated from the student's IEP in a material or substantial way.

*Id.* at 9.  The SRO therefore reversed the IHO decision directing the district to pay Q.W.H.'s tuition at Cooke.  *Id.* at 10.  Plaintiffs appeal the SRO Decision to this Court, and the parties have cross-moved for summary judgment.[12]

## DISCUSSION[13]

## I.    Standard of Review

"In considering an IDEA claim, a district court 'must engage in an independent review of the administrative record and make a determination based on a preponderance of the evidence.'"  *C.L. v. Scarsdale Union Free Sch. Dist.*, 744 F.3d 826, 837-38 (2d Cir. 2014) (quoting *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 112 (2d Cir. 2007)).  In undertaking this independent review, courts are "restrained by our lack of specialized knowledge and educational expertise; we must defer to the administrative decision particularly where the state officer's review has been thorough and careful."  *M.W. ex rel. S.W. v. N.Y. City Dep't of Educ.*, 725 F.3d 131, 138-39 (2d Cir. 2013) (internal quotations and alteration omitted); *see also M.O. v. N.Y. City Dep't of Educ.*, 793 F.3d 236, 243 (2d Cir. 2015) ("While the district court

---

[12]    Summary judgment, which is the preferred vehicle for determining IDEA cases, functions differently in the IDEA context.  *See T.Y. v. N.Y. City Dep't of Educ.*, 584 F.3d 412, 418 (2d Cir. 2009).  "[A] motion for summary judgment in an IDEA case often triggers more than an inquiry into possible disputed issues of fact.  Rather, the motion serves as a pragmatic procedural mechanism for reviewing a state's compliance with the procedures set forth in IDEA."  *Lillbask ex rel. Mauclaire v. State of Conn. Dep't of Educ.*, 397 F.3d 77, 83 n.3 (2d Cir. 2005) (internal quotations omitted).  Although styled as a motion for summary judgment, the procedure, in substance, is an appeal from an administrative determination.  *C.U. v. New York City Dep't of Educ.*, 23 F. Supp. 3d 210, 222 (S.D.N.Y. 2014) (citing *Lillbask*, 397 F.3d at 83 n.3).

[13]    The Court refers to the parties' briefing on their cross-motions for summary judgment as "Pls. Mem.," "Def. Mem.," "Pls. Reply," and "Def. Reply."

must base its decision on the preponderance of the evidence, it must give due weight to the administrative proceedings, mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy.").

Two factors guide the level of deference owed to the administrative opinions: "the quality of the [administrative] opinion and the court's institutional competence." *C.F. ex rel. R.F. v. N.Y. City Dep't of Educ.*, 746 F.3d 68, 77 (2d Cir. 2014). To determine whether the SRO's review has been appropriately thorough and careful, "courts must look to the factors that normally determine whether any particular judgment is persuasive, for example, whether the decision being reviewed is well-reasoned, and whether it was based on substantially greater familiarity with the evidence and the witnesses than the reviewing court." *M.W.*, 725 F.3d at 139 (internal quotations omitted); *M.O.*, 793 F.3d at 243 ("Deference is particularly appropriate when the state officer's review 'has been thorough and careful,' but still we do not 'simply rubber stamp administrative decisions.'" (quoting *R.E.*, 694 F.3d at 184)). The "institutional competence" question hinges on whether a matter involves "'persistent and difficult questions of educational policy,'" *C.L.*, 744 F.3d at 838 (quoting *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 208 (1982)), or "'issues of law,' such as 'the proper interpretation of the federal statute and its requirements,'" *Lillbask*, 397 F.3d at 82 (2d Cir. 2005) (quoting *Mrs. B. v. Milford Bd. of Educ.*, 103 F.3d 1114, 1122 (2d Cir. 1997)) (alteration omitted).

## II.    *Burlington/Carter* Test

A parent who is dissatisfied with a school district's proposed placement for his or her disabled child may enroll the child in private school and then seek tuition reimbursement from the state. "Parents who unilaterally place their child in a private school do so 'at their financial risk.'" *M.O.*, 793 F.3d at 243 (quoting *Reyes ex rel. R.P. v. N.Y. City Dep't of Educ.*, 760 F.3d

211, 215 (2d Cir. 2014)).  Whether the parent's request for reimbursement will be successful is determined by the so-called *Burlington/Carter* test, "which looks to (1) whether the school district's proposed plan will provide the child with a free appropriate public education; (2) whether the parents' private placement is appropriate to the child's needs; and (3) a consideration of the equities."  *C.F.*, 746 F.3d at 73; *see also T.M. v. Cornwall Cent. Sch. Dist.*, 752 F.3d 145, 152 (2d Cir. 2014) (citing *Florence Cnty. Sch. Dist. Four v. Carter*, 510 U.S. 7, 15-16 (1993)).

Prong one of the *Burlington/Carter* test requires the DOE to establish that the IEP was appropriate, *i.e.*, that it would actually provide a FAPE.  *M.W.*, 725 F.3d at 135.  "Under New York's Education Law § 4404(1)(c), the local school board bears the initial burden of establishing the validity of its plan at a due process hearing."  *M.O.*, 793 F.3d at 243.  The first prong of *Burlington/Carter* involves "a two-part inquiry that is, first, procedural, and second, substantive."  *M.W.*, 725 F.3d at 139.[14]  Relative to the substantive validity, the test asks "whether [the IEP] was 'reasonably calculated to enable the child to receive educational benefits.'"  *T.M.*, 752 F.3d at 160 (quoting *Rowley*, 458 U.S. at 207).  An IEP is substantively adequate if the IEP is "likely to produce progress, not regression, and [if the IEP] affords the student with an opportunity greater than mere trivial advancement.  However, it need not furnish every special service necessary to maximize each handicapped child's potential."  *M.O.*, 793 F.3d 239 (internal quotations omitted); *see also M.H.*, 685 F.3d at 224; *A.C. v. Bd. of Educ. of Chappaqua Cent. Sch. Dist.*, 553 F.3d 165, 173 (2d Cir. 2009).  If the IEP is not substantively adequate, the parent is automatically entitled to tuition reimbursement.  *R.E.*, 694 F.3d at 190.

Plaintiffs' arguments in this Court implicate the first *Burlington/Carter* prong.  The crux of Plaintiffs' appeal is a challenge to the appropriateness of DOE's proposed placement,

---

[14]    Plaintiffs are not challenging in this Court the procedural validity of the IEP, and therefore the Court dispenses with any discussion of the procedural requirements of an appropriate IEP.

although Plaintiffs also challenge, albeit fleetingly, the appropriateness of the 12:1:1 special class

staffing ratio that was recommended in Q.W.H.'s IEP.  *See generally* Pls. Mem.

### A.  The IEP Recommendation of a 12:1:1 Class Was Substantively Appropriate

Plaintiffs argue that the SRO, in concluding that the IEP recommendation of 12:1:1

program was appropriate, "erroneously equated the 12:2 program at Cooke (twelve students to

two teachers) with a 12:1:1 program (twelve students, one teacher, and a paraprofessional)."  Pls.

Mem. at 25.  Plaintiffs insist that the SRO's conclusion contradicts the record.  They argue that

the second teacher at Cooke was a full-fledged teacher with at least a college education and that

the presence of a second teacher was an important factor in Q.W.H.'s success at Cooke.  *Id.* at

25.  Plaintiffs also note that the IEP did not call for small group instruction as one of Q.W.H.'s

needs and complain that a 12:1:1 program would be substantially similar to the program that

Q.W.H. attended during the first four years of elementary school during which she did not

progress academically.  *Id.* at 5.

Plaintiffs' argument that the SRO erred in finding that the IEP recommendation of a

12:1:1 class staffing ratio was substantively appropriate cannot be sustained.  Both the IHO and

the SRO concluded that the 12:1:1 special class recommendation was substantively appropriate

and reasonably calculated to provide Q.W.H. with meaningful educational benefits.  SRO

Decision at 5-6; IHO Decision at 7.  After a thorough review, the Court agrees.

The IHO's and SRO's conclusions that the 12:1:1 special class program was appropriate

for Q.W.H. were thorough, well-reasoned, and supported by the record.  "'[D]eterminations

regarding the substantive adequacy of an IEP should be afforded more weight than

determinations concerning whether the IEP was developed according to the proper procedures.'"

*C.F.*, 746 F.3d at 77 n.7 (quoting *M.H.*, 685 F.3d at 244).  "Decisions involving a dispute over an

appropriate educational methodology"—here, the adequacy of a 12:1:1 special class staffing

ratio—are subject to considerable deference.  *C.F.*, 746 F.3d at 77 n.7.  Moreover, the Court's

deference is particularly appropriate when, as here, the IHO and the SRO are in agreement.  *B.K.*

*v. N.Y. City Dep't of Educ.*, 12 F. Supp. 3d 343, 360 (E.D.N.Y. 2014).  Accordingly, the Court

reviews the SRO Decision deferentially as to her conclusion regarding the appropriateness of the

12:1:1 class.

     The SRO considered evidence from Cooke that Q.W.H. functioned well in a class of

twelve students, typically staffed with a head teacher and a teaching assistant.  SRO Decision at

5.  The SRO noted that the CSE was aware that Q.W.H. was receiving some instruction in

smaller groups but also noted that a 12:1:1 special class allows for smaller group instruction at

times.  *Id*. at 6.  The SRO noted that no one objected to the 12:1:1 special class recommendation

at the CSE meeting.  *Id*.  Similarly, the IHO concluded "that based on the testimony adduced at

the hearing[,] . . . the IEP was . . . substantively appropriate and was crafted to meet the

individual education needs of the student" and that the testimony of the school psychologist on

the class size was "credible and not rebutted by the Parent."  IHO at 7.

     Although the Plaintiffs insist that the record supports their argument that Q.W.H.'s

program at Cooke functioned as a 12:2 class, Pls. Mem. at 25, the SRO concluded that Q.W.H's

program at Cooke "functioned, for all intents and purposes, as a 12:1+1 classroom."  SRO

Decision at 5.  Giving due deference to the SRO, this Court is unconvinced that the difference

between the alleged 12:2 program at Cooke and a 12:1+1 class is anything but negligible and is

certainly not so substantial as to constitute the denial of a FAPE.  The Court therefore upholds

the SRO's determination that the 12:1:1 special class recommendation was substantively

appropriate and reasonably calculated to provide Q.W.H. with meaningful educational benefits.

**B.      P373K Was Presumptively Capable of Fulfilling the IEP**

The heart of Plaintiffs' appeal is that the SRO erred when she relied on *R.E. v. N.Y. City Dep't of Educ.*, 694 F.3d 167 (2d Cir. 2012), to hold that a parent's challenge to a placement is, across the board, generally speculative and not an appropriate basis for unilateral placement if the student never attended the recommended placement.  Since the SRO Decision, the Second Circuit decided *M.O. v. N.Y. City Dep't of Educ.*, 793 F.3d 236 (2d Cir. 2015), and directly addressed this issue.  Defendant argues that *M.O.* supports the SRO Decision, albeit on different grounds.  Defendant concedes, as it must, that the SRO was wrong to hold that objections are across the board speculative and impermissible when a student does not attend the placement, but because Plaintiffs' objections did not challenge the capacity of P373K to implement Q.W.H.'s IEP, Defendants argue that the SRO's conclusion was correct that a unilateral placement was not justified.  Def. Mem. at 2, 23-26.

**1.   Legal Framework**

The Second Circuit in *M.O.* made clear that "*R.E.* does not foreclose *all* prospective challenges to a child's proposed placement school" but instead "stands for the unremarkable proposition that challenges to a school district's proposed placement school must be evaluated prospectively (i.e., at 'the time of the parents' placement decision') and cannot be based on mere speculation." *M.O.*, 793 F.3d at 244 (emphasis in original).  The Second Circuit further specified what constitutes a permissible challenge: "[w]hile it is speculative to conclude that a school with the capacity to implement a given student's IEP will simply fail to adhere to that plan's mandates, it is not speculative to find that an IEP cannot be implemented at a proposed school that lacks the services required by the IEP." *M.O.*, 793 F.3d at 244 (citations omitted).[15]  The

---

[15]      District courts that have subsequently examined *M.O.* have rephrased this distinction.  One court distinguished "between conclusory claims that the school simply *would not* implement an IEP and claims that the

Second Circuit provided two examples of non-speculative challenges: (1) a proposed placement that was not seafood free could not implement an IEP recommending a seafood-free environment for a child with a life threatening seafood allergy, *M.O.*, 793 F.3d at 244 (citing *D.C. ex. rel. E.B. v. N.Y. City Dep't of Educ.*, 950 F. Supp. 2d 494, 513 (S.D.N.Y. 2013)); and (2) a proposed school that provided only in-class occupational therapy in a group setting could not implement an IEP recommending one-on-one occupational therapy outside of the classroom, *M.O.*, 793 F.3d at 244 (citing *B.R. ex. rel. K.O. v. N.Y. City Dep't of Educ.*, 910 F. Supp. 2d 670, 676-79 (2d Cir. 2012)).  "School districts do not have 'carte blanche' to assign a child to a school 'that cannot satisfy the IEP's requirements.'"  *M.O.*, 793 F.3d at 244 (quoting *T.Y.*, 584 F.3d at 420).  But if there is an adequate IEP, there will be few circumstances in which a parent can successfully challenge a placement if their child never attended the school,[16] because mere "[s]peculation that the school district will not adequately adhere to the IEP is not an appropriate basis for unilateral placement."  *R.E.*, 694 F.3d at 195; *see also T.F. v. N.Y. City Dep't of Educ.*, No. 14CV3401, 2015 WL 5610769, at *7 (S.D.N.Y. Sept. 23, 2015), *appeal withdrawn*, (Jan. 12, 2016).  Similarly, a substantive attack on a child's IEP that is couched as a challenge to the adequacy of the proposed placement is also not a permissible challenge—those types of challenges do not relate to the placement's capacity to implement the IEP but to the appropriateness of the IEP's

---

school *could not* implement an IEP." *W.W. & D.C. v. N.Y. City Dep't of Educ.*, No. 14 CIV. 9495(PAC), 2016 WL 502025, at *6 (S.D.N.Y. Feb. 8, 2016) (emphasis in original).  Another distinguished "between deciding that a placement was inappropriate because 'a school with the capacity to implement a given student's IEP will simply fail to adhere to that plan's mandates . . . ' and finding that the placement was inappropriate because 'a proposed school lacks the services required by the IEP.'" *GB v. N.Y. City Dep't of Educ.*, No. 14 CIV. 9951(CM), 2015 WL 7351582, at *17 (S.D.N.Y. Nov. 5, 2015) (quoting *M.O.*, 793 F.3d at 244).  These courts found that reaching the former conclusion was "speculative" when the student had not enrolled in the school, but the latter conclusion was non-speculative.

[16]     In addition to the examples provided in *M.O.*, this Court can envision other examples of non-speculative challenges that a parent could raise to a placement without the child attending the school: if a wheelchair-bound child were placed in a multi-level school that lacked elevators or ramps, the parents could successfully challenge the placement without enrolling in the school; or if a mentally disabled child were placed at a school that only serves academically gifted students, the parents could successfully challenge the placement without enrolling the student.

substantive recommendations, which must be determined by reference to the written IEP itself.
*M.O.*, 793 F.3d at 245.

 *M.O.* also clarifies who bears the burden of showing that the proposed placement has the
capacity to implement the student's IEP.  If a student's IEP is substantively adequate, it is
incumbent upon the parents to adduce some evidence that the school district would not have
adhered to the IEP.  *See id.* at 245-46; *see also N.S. v. N.Y. City Dep't of Educ.*, No. 13-CV-7819
(VEC), 2014 WL 2722967, at *13 (S.D.N.Y. June 16, 2014) (holding that the school district
discharges its initial burden of proof by establishing that a student's IEP is substantively
adequate, and then the parents must establish that the school district would not have adhered to
the written plan).  Although the school district bears the ultimate burden of persuasion that the
placement is appropriate, absent a challenge based on non-speculative evidence available at the
time the parents opted out of the placement, "the school district [is] not required to present
evidence regarding the adequacy of [the recommended placement] at the impartial hearing."
*M.O.*, 793 F.3d at 246.[17]

---

[17] In *W.W.*, Judge Crotty held: "the school district bears the burden of showing that the proposed placement school has the capacity to implement the child's IEP.  The Court notes that this is not an explicit holding [of *M.O.*] but rather a necessary inference."  *W.W.*, 2016 WL 502025, at *7 (internal citation omitted).  Judge Crotty acknowledged that the school district's obligation arose only in the face of a prospective challenge to the school's capacity to implement the IEP based on "nonspeculative evidence" that was available at the time the parents opted out of the district's placement.  *Id.* at *7, n.7.  "Such evidence may be used to rebut the school district's evidence, but that evidence is not required to raise a prospective challenge in a due process complaint."  *Id.* at *7.  It is not entirely clear whether Judge Crotty was discussing the pleading requirements of a DPC or holding that, in the face of a valid challenge articulated in a DPC, the school district has the obligation in the first instance to present evidence that the district can comply with the IEP at the proposed placement site.  In any event, *W.W.* did not hold that, even absent a presumptively valid challenge to the placement, the district nonetheless has the burden of producing evidence before the IHO that the district can and will comply with the IEP at the recommended placement.

## 2. The Court Reviews *De Novo* Plaintiffs' Challenges to P373K's Capacity to Implement Q.W.H.'s IEP

As noted previously, the SRO rejected the Plaintiffs' challenge to the proposed placement as barred by *R.E.*  SRO Decision at 6-9.  The parties dispute the level of deference to be afforded the administrative proceedings.  Plaintiffs urge that the SRO Decision is entitled to no deference because it misunderstood the Second Circuit's decision in *R.E.*, issued no findings of fact, set forth no reasoning, and refused to perform any analysis of the appropriateness of the placement to P373K.  Pls. Reply at 8-9.  The Court agrees that the SRO Decision is entitled to no deference regarding the appropriateness of the proposed placement because it was decided based on an erroneous interpretation of *R.E.*  Moreover, the SRO's one sentence that "assum[es] for the sake of argument" that the Plaintiffs could make their claims, provided only a cursory analysis that is neither thorough nor well-reasoned.  SRO Decision at 9.

Plaintiffs urge this Court instead to give deference to the IHO Decision, which Plaintiffs argue reflects first-hand encounters with the witnesses, a correct interpretation of the law, and thorough consideration of the evidence in the record.  Pls. Reply at 10-11.  When a district court determines that the SRO decision is "inadequately reasoned," "a better-reasoned IHO opinion may be considered instead." *R.E.*, 694 F.3d at 189.  The Court is unconvinced, however, that the IHO Decision presents a well-reasoned opinion.  The IHO failed to analyze whether the Plaintiffs' objections to the proposed placement as articulated in their DPC were, in actuality, permissible prospective challenges before it concluded that the DOE had failed to meet its burden to show that the placement was appropriate.  IHO Decision at 7-8.  More problematic, the IHO based her conclusion that the DOE had failed to offer an appropriate placement on an argument that Plaintiffs did not even raise in their DPC.  In doing so, the IHO imposed on the DOE an obligation to present evidence even in the absence of a parent's non-speculative

17

challenge to the placement's capacity to adhere to the IEP, a burden the Second Circuit disclaimed in *M.O.*  Thus, the IHO also misapplied applicable law.

In any event, this particular aspect of Plaintiffs' challenge—whether they have presented permissible prospective objections to the placement—is an issue of law that must be reviewed *de novo*.  *Cf. M.O. v. N.Y. City Dep't of Educ.*, 996 F. Supp. 2d 269, 271 (S.D.N.Y. 2014) (reviewing *de novo*, as an issue of law, whether a certain type of evidence is required for DOE to meet its burden of proof), *aff'd*, 793 F.3d 236 (2d Cir. 2015).

### 3. Plaintiffs Failed to Raise a Non-Speculative Claim that P373K Could Not or Would Not Implement the IEP

As previously discussed, Q.W.H.'s IEP was substantively adequate.  Therefore, in order to challenge the placement, the parent must raise a non-speculative claim that the proposed placement would not have adhered to the IEP.  *R.E.*, 694 F.3d at 195; *B.K.*, 12 F. Supp. 3d at 370-72.

Plaintiffs argue that the DOE's proposed placement denied Q.W.H. a FAPE because:  (1) "the proposed school had only one junior high school class in what was otherwise a high school;" (2) "the academic range of the students in the junior high class was too wide and too advanced to be an appropriate learning environment for Q.W.H.;" (3) "paraprofessionals, as opposed to teachers, did much of the teaching in the class;" and (4) no one, not even the DOE's rebuttal witness, confirmed that the school offered a 12:1:1 class as required under Q.W.H.'s IEP.  Pls. Mem. at 2.  Plaintiffs argue that L.W.'s objections are not speculative insofar as they are based on what she saw when she visited P373K and what she was told by DOE personnel about the one sixth grade class in the school.  Pls. Mem. at 22.

The Court disagrees—Plaintiffs' first three objections to P373K are exactly the type of objection that is foreclosed by *R.E.* and *M.O.*  These objections are either based on L.W.'s

18

personal belief that the school would have been inappropriate or are, in actuality, substantive attacks on the adequacy of the IEP couched as challenges to the placement.[18]  Plaintiffs' fourth objection, that P373K has no capacity to offer a 12:1:1 class, was waived because it was not raised in the DPC.

Plaintiffs' contention that P373K was an inappropriate placement because it had only one junior high school class in what was otherwise a high school is an impermissible challenge because it does not relate to whether the school could implement the IEP, which is silent on the need for Q.W.H. to avoid an environment with older children.  *See M.O.*, 793 F.3d at 245 (holding that an objection that recommended placement was inappropriate because the parent said that the child would "shut down completely" if put there is a subjective concern that does not demonstrate the school lacked IEP-mandated services).[19]  The Court does not minimize L.W.'s concerns about her child's ability to thrive in an environment comprised predominantly of older children, but this objection does not justify Q.W.H.'s unilateral placement because it does not relate to P373K's capacity to implement IEP-mandated services.  *See Y.F. v. N.Y. City Dep't of Educ.*, No. 15 CIV. 6322 (LGS), 2015 WL 4622500, at *7 (S.D.N.Y. July 31, 2015) (holding that plaintiffs' arguments about the proposed placement, ranging from its size, to its

---

[18]    Plaintiffs attempt to distinguish *M.O.* from the instant case by arguing that, in *M.O.*, the Second Circuit focused on "the overlapping nature of the allegations" supporting both the challenge to the IEP and the challenge to the appropriateness of the proposed placement. Pls. Reply at 6.  Plaintiffs argue that, in *M.O.*, "[b]ecause the Court found that the IEP was appropriate, it did not separately consider the same challenges to the school placement." Pls. Reply at 6.  Plaintiffs argue that, in contrast, their challenges to the proposed placement relate solely to the implementation of the IEP at P373K and do not overlap with or relate to the substantive adequacy of the IEP. Pls. Reply at 6-7. The Court reads *M.O.* to preclude broadly "substantive attacks to [an] IEP that [are] couched as challenges to the adequacy of [a placement]," regardless of whether those attacks expressly or impliedly overlap with challenges the parent separately raises to the IEP.  *M.O.*, 793 F.3d at 245.

[19]    It appears that L.W.'s real concern was not that the school was unable to adhere to the IEP but that she believed Q.W.H. would struggle if she was one of the youngest children in the building with few peers her age. Ex. L. Her testimony during the impartial hearing voiced that concern, stating that "socially" the class would be "self-contained" and "[t]hey wouldn't have any interactions with the rest of the school." Tr. 186-87.  In L.W.'s view, this would be bad for Q.W.H. "because she somehow fights for friends, that [being in a small, self-contained class] would not have really helped her to spread out or branch out."  *Id.*

19

curriculum, to its environment, are not contrary to any specific requirement in the IEP and are impermissibly speculative arguments that are really substantive attacks on the IEP); *S.E. v. N.Y. City Dep't of Educ.*, 113 F. Supp. 3d 695, 710 (S.D.N.Y. 2015) (holding that plaintiff could not successfully challenge a placement by arguing that the school's self-contained 6:1:1 classroom did not conform with the IEP because it did not allow for the child to interact with typically-developing peers when social interaction with typically-developing children was not mandated in the IEP).

Plaintiffs' second concern is that the academic range of the students in P373K's sixth grade class was too wide and too advanced to be an appropriate learning environment for Q.W.H.  This is also an impermissible prospective challenge.  Plaintiffs' objection is based on her testimony that, during her visit, the Assistant Principal told her the students in the sixth grade class at P373K were at academic levels ranging from first to seventh grade.  Tr. 185, 201. Defendants argue that this objection is not a challenge to P373K's capacity to implement Q.W.H.'s IEP because nothing in the IEP requires Q.W.H. to be grouped with students of largely identical academic abilities.  Def. Mem. at 29.

Plaintiffs argue that because state regulations mandate that Q.W.H. not be placed in a class that exceeds a three year academic range, Pls. Reply at 7 (quoting 8 N.Y.C.R.R. §§ 200.6(h)(2)-(7)), the issue would not have been addressed in an IEP because it is "too obvious to state."  Pls. Reply at 7.  But the regulations on which Plaintiffs rely do not create the categorical bar that Plaintiffs urge.  Section 200.6(h)(7) provides that:

> Each district operating a special class wherein the range of achievement levels in reading and mathematics exceeds three years shall . . . provide the committee on special education and the parents and teacher of students in such class a description of the range of achievement in reading and mathematics, and the general levels of social development, physical development and management needs in the class, by November 1st of each year.

8 N.Y.C.R.R. § 200.6(h)(7).  If Q.W.H. had enrolled at P373K, if the class had in fact included children with the broad range of achievement levels about which L.W. was concerned,[20] and if the school district had not provided the required information, *then*, *perhaps*, Q.W.H. would have had a permissible challenge.  But the fact that this whole scenario is so hypothetical is precisely why this objection is a speculative, and therefore impermissible, challenge to the proposed placement.[21]

Plaintiffs' third objection is that the paraprofessionals, as opposed to teachers, would be teaching.  This is also an impermissible prospective challenge.  Plaintiffs' challenge is based on her belief that, during her visit, the Assistant Principal told her that the paraprofessional, not the teacher, would instruct the students.  Tr. 202-03.[22]  Plaintiffs contend that Q.W.H.'s need for a teacher to teach the class is once more the type of concern that is too obvious to state in the IEP.  Pls. Reply at 7.  Defendants argue that Plaintiffs' challenge is merely speculative and "too nebulous an assertion to support a finding of denial of FAPE."  Def. Reply at 6.  From a review of the record, Plaintiffs' concern regarding paraprofessionals boils down to her belief that paraprofessionals do not have the appropriate training to address Q.W.H.'s learning disabilities.

---

[20]    DOE introduced testimony during the impartial hearing from the Assistant Principal at P373K that corrected Plaintiffs' misunderstanding of the breadth of academic achievement of the students at the recommended placement.  He testified that he believed the students in the junior high school class are "typical of many of our students, who range from pre-K to third grade."  Tr. 212-13.  Q.W.H.'s achievement level falls within that same range.  Ex. 7 at 1.

[21]    Plaintiffs' concerns about the classroom's academic level appear to stem from L.W.'s belief that Q.W.H. "would be one of the lowest functioning children in the school academically."  *See* Ex. L.  Putting aside the obvious fact that some child has to be the lowest functioning of a group, the IEP did not mandate any particular functional grouping for Q.W.H.  Her IEP did include annual goals that Q.W.H. "demonstrate enhanced self perception[,] decreased anxiety & improve[d] self-concept [sic]," Ex. 7 at 8-9, but there is no evidence in the IEP—beyond L.W.'s speculation—that the classroom environment at P373K would frustrate Q.W.H.'s ability to achieve those goals.

[22]    As with the academic achievement levels of the children in the class, this assertion was contradicted by the DOE at the impartial hearing.  The Assistant Principal testified that the classes at P373K are taught by the teachers, and the paraprofessionals "assist the teacher.  They are part of the instructional team, and very often they split into groups that the paraprofessionals will work under the supervision of the teacher."  Tr. 213.

Ex. L.  Plaintiffs' concerns regarding the role of the paraprofessional in the classroom is really a

substantive attack on the adequacy of the IEP's recommended 12:1:1 class staffing ratio (versus

the 12:2 ratio L.W. alleges is used at Cooke), not a challenge to the adequacy of P373K.

Fourth and finally, Plaintiffs argue that P373K is an inappropriate school placement

because P373K does not have a 12:1:1 sixth grade class available as mandated by Q.W.H.'s IEP.

Pls. Reply at 3-5.  Plaintiffs' concerns are based on L.W.'s observations when she visited P373K

of the only class available for sixth graders, which she understood would have been Q.W.H.'s

class.  Tr. 198-200.  L.W. testified that she observed only eight students, Tr. 198, and two adults

(one teacher and another adult whom she believed was a paraprofessional), Tr. 199.

Accordingly, Plaintiffs argue that L.W. observed an 8:1:1 program, and not the 12:1:1 program

mandated by Q.W.H.'s IEP.  Pls. Reply at 1.

Plaintiffs did not raise this challenge in their DPC,[23] *see generally* Ex. 1, and the absence

of these allegations in the DPC warrants dismissal of this claim.  Def. Reply at 1-3.[24]  This Court

---

[23]     It seems likely that this issue was not raised in the DPC because L.W. believed that she saw a sixth grade class that had eight children, one teacher, and one paraprofessional.  Had Q.W.H. attended the school, the class would have been a 9:1:1 class, assuming no other children joined and none of the existing children dropped out. While 9:1:1 is not 12:1:1, it is unlikely that small difference in ratio would have amounted to the denial of a FAPE.

[24]     There is disagreement in this Circuit whether failure to raise a claim in the DPC waives the claim. *Compare M.O.*, 996 F. Supp. 2d at 271 ("Plaintiffs argue that the IEP was inadequate due to a variety of defects, most of which were not specifically raised before the state hearing officers and thus are not appropriate for review at this stage." (internal citations omitted)); *and A.M. ex rel. Y.N. v. N.Y. City Dep't of Educ.*, 964 F. Supp. 2d 270, 282-83 (S.D.N.Y. 2013) (holding that a failure to include a challenge to the appropriateness of a recommendation in a due process complaint normally precludes consideration of the claim by the IHO and SRO, as well as the court reviewing those decisions); *and B.M. v. N.Y. City Dep't of Educ.*, No. 12-cv-3247 (JMF), 2013 WL 1972144, at *7 n.2 (S.D.N.Y. May 14, 2013) ("The fact that a court may consider new *evidence*, however, does not mean that it may consider a new *argument* or *claim*." (emphasis in original)), *aff'd*, 569 F. App'x 57 (2d Cir. 2014); *and B.P. v. N.Y. City Dep't of Educ.*, 841 F. Supp. 2d 605, 611 (E.D.N.Y. 2012) ("The scope of the inquiry of the IHO, and therefore the SRO and this Court, is limited to matters either raised in the Plaintiffs' impartial hearing request or agreed to by Defendant.") *with M.P.G. ex rel. J.P. v. N.Y. City Dep't of Educ.*, No. 08-cv-8051(TPG), 2010 WL 3398256, at *8 (S.D.N.Y. Aug. 27, 2010) ("there is arguably no reason that issues not raised in IDEA administrative proceedings may not be raised on appeal to the district court since, by statute, the district court's review may include the consideration of additional evidence." (citing *Arlington Cent. Sch. Dist. v. D.K. and K.K.*, No. 02-cv-2117 (DLC), 2002 WL 31521158, at *9 (S.D.N.Y. Nov. 14, 2002)) *and P.G. v. N.Y. City Dep't of Educ.*, 959 F. Supp. 2d 499, 509-10 (S.D.N.Y. 2013) (concluding that the DOE "opened the door" to an issue regarding the appropriateness of an IEP's 12:1:1 recommendation, which the parents would have otherwise waived, "when it raised the issue in its

believes that permitting school placement challenges to be advanced for the first time in the district court effectively eliminates the exhaustion requirement and undercuts the utility of an administrative process.  Although the Court recognizes that the Second Circuit has not definitively decided the issue, it finds instructive the Second Circuit's recent discussion in *B.P. v. N.Y. City Dep't of Educ.*, No. 15-16-CV, 2015 WL 9487873, at \*3 (2d Cir. Dec. 30, 2015) (summary order).  There, the Second Circuit found no error in a district court's decision not to address claims that plaintiffs did not raise in their due process complaint.  *Id.*  The Second Circuit reasoned that "[t]he due process complaint serves as fair notice to the school district, and gives the district 30 days to resolve the complaint to the parents' satisfaction before a hearing." *Id.*  Because Plaintiffs did not raise in their DPC the issue of P373K's capacity to offer Q.W.H. a sixth grade 12:1:1 class, the DOE did not have fair notice of this claim and the argument was waived.[25]

Putting aside whether Plaintiffs waived this argument as a technical legal matter by failing to raise it in their DPC, the IHO, who raised this issue *sua sponte*, did exactly what the *M.O.* court held was improper: she imposed on the DOE the obligation to come forward with proof that P373K could comply with the IEP even though Plaintiffs had failed to raise a non-speculative claim that P373K could not comply.  The IHO appeared to be concerned that if there were no affirmative obligation on a school district to prove—in every case—that "the placement

---

opening argument and elicited testimony about it from one of its witnesses on direct examination." (citing *M.H.*, 685 F.3d at 250-51)).

[25]     The discussion of waiver in *B.P.* is further supported by a long line of cases requiring administrative exhaustion of all claims brought under, or potentially brought under, the IDEA.  *See, e.g.*, *Cave v. E. Meadow Union Free Sch. Dist.*, 514 F.3d 240, 245-46 (2d Cir. 2008) ("Failure to exhaust the administrative remedies deprives the court of subject matter jurisdiction.  The purpose of the exhaustion rule is to channel disputes related to the education of disabled children into an administrative process that could apply administrators' expertise in the area and promptly resolve grievances." (internal quotations and citations omitted)); *Heldman on behalf of T.H. v. Sobol*, 962 F.2d 148, 159 (2d Cir. 1992) ("The exhaustion doctrine prevents courts from undermining the administrative process and permits an agency to bring its expertise to bear on a problem as well as to correct its own mistakes."); *A.M.*, 964 F. Supp. 2d at 283 (collecting cases).

offered would be able to effectively implement the IEP . . . a school district could load up an IEP with all sorts of services and accommodations and never have to show that they were able to actually provide an appropriate placement."  IHO Decision at 8.

The *M.O.* Court made clear that this cynical view of how public schools comply with IDEA is not correct.  Absent a non-speculative claim that the recommended placement will not or cannot comply with the IEP,[26] the school district has no affirmative obligation to present evidence that the placement will and can comply with the IEP.[27]

Because the Court concludes that the DOE offered Q.W.H. a FAPE, the Court does not reach the second or third prongs of *Burlington/Carter* regarding the appropriateness of Cooke as a placement or whether the equities favor reimbursement.

---

[26]     Had Plaintiffs' DPC asserted that P373K could not comply with the IEP because it had no 12:1:1 sixth grade class (which would have been a non-speculative, and therefore a legally appropriate, challenge to the placement), the school district would have had an obligation to come forward with evidence to show that P373K had a 12:1:1 sixth grade class, or a ratio that was similar enough to provide Plaintiff with a FAPE under the requirements of the IEP, and to bear the burden of persuasion on that fact.

[27]     Plaintiffs complain that, despite L.W.'s September 18, 2012 letter to the CSE memorializing L.W.'s concerns about the proposed placement, "[t]he DOE did not respond to [the] letter and took no steps to dispute the information conveyed to [L.W.] during her visit, remedy the problems identified with the placement, or offer a different placement." Pls. Mem. at 22.  The Court notes that Plaintiffs, who were represented by counsel, did not actually raise with the DOE the one non-speculative concern with the placement, to wit, whether P373K actually had a 12:1:1 sixth grade class.  *See* Ex. L.

If there are factual concerns with whether a placement can comply with the IEP, the onus has to be on the parents in the first instance to communicate those concerns to the DOE and to request a response if there are facts that would make the difference between accepting the placement and unilaterally rolling the dice on tuition reimbursement.  That said, this Court adds its voice to the voice of other judges, *see, e.g.*, *T.F.*, 2015 WL 5610769, at *6,* who have encouraged DOE to adopt procedures to respond to factual concerns about a placement so that the parents have the facts and are not operating under a misunderstanding regarding the capacity of the recommended placement *before* they commit themselves to private school tuition that may not be reimbursed.  Although this Court understands that, for some parents, tuition reimbursement is "nice to have," but they are going to send their children to private school regardless, for other parents, the stakes are higher because they cannot afford to send their child to private school if reimbursement is denied.  In any event, parents are entitled to make decisions based on a correct factual understanding of what the district is proposing, and that requires the DOE to be more responsive when such concerns are raised.

**CONCLUSION**

For the foregoing reasons, Plaintiffs' motion for summary judgment is DENIED.

Defendant's cross-motion for summary judgment is GRANTED.  The Clerk of the Court is

directed to enter judgment for Defendant, to terminate Dkt. 15 and Dkt. 23, and to terminate the

case.

**SO ORDERED.**

**Dated: March 7, 2016**
**New York, NY**

_____
**VALERIE CAPRONI**
**United States District Judge**

**APPENDIX**

| Acronym | Stands for |
|---|---|
| CSE | Committee on Special Education |
| DOE | Department of Education |
| DPC | Due Process Complaint |
| FAPE | Free Appropriate Public Education |
| FNR | Final Notice of Recommendation |
| IDEA | Individuals with Disabilities Education Act |
| IEP | Individualized Education Program |
| IHO | Impartial Hearing Officer |
| NYCCRR | New York Compilation Codes, Rules and Regulations |
| L.W. | Q.W.H.'s parent |
| Q.W.H. | The child with a disability seeking reimbursement for her private school tuition |
| SRO | State Review Officer |